IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARICRUZ CARAVANTES,

                    Plaintiff,                              3:13-cv-00355-PK

v.                                                         OPINION AND ORDER

STATE OF OREGON, d/b/a Oregon
Commission for the Blind, and
OREGON INDUSTRIES FOR THE
BLIND,

                    Defendants.

_____

PAPAK, Magistrate Judge:

        Plaintiff Maricruz Caravantes brings this action against defendants State of Oregon, doing

business as the Oregon Commission for the Blind ("OCB"), and the Oregon Industries for the

Blind ("OIB"), alleging that, during her employment with the OIB, she was discriminated against

on the basis of her sex, race, and national origin and was subjected to a hostile work environment

Page 1 - OPINION AND ORDER

on the basis of her race and national origin. Now before the court is defendants' motion for partial summary judgment (#68). For the reasons set forth below, defendants' motion is granted in part and denied in part.

## FACTUAL BACKGROUND[1]

"Defendant OCB is a statutorily created Oregon state agency," Second Amended Complaint, #22, ¶ 2.2, that was responsible for establishing and maintaining Defendant OIB while the OIB was in operation,[2] Declaration of Dacia Johnson ("Johnson Decl."), #70, ¶ 4. "The purpose of [the] OIB was to provide . . . work training opportunities for individuals with disabilities as part of their vocational rehabilitation." *Id.* ¶ 5. At all relevant times, Desiree Paschall was the Director of the OIB, Leslie Jones was the Director of Administrative Services at the OCB, and Linda Mock was the Director of the OCB. Declaration of Maricruz Caravantes ("Caravantes Decl."), #74, ¶¶ 1-2; *see also* Ex. 15, Declaration of Patrick Leo McGuigan ("McGuigan Decl."), #73, at 11, 26. Both Paschall and Jones reported to Mock. Ex. 15, McGuigan Decl., #73, at 28. As Director of Administrative Services, Jones was in charge of the budget for the OCB and the OIB. *Id.* at 26-27. When the OIB wished to hire an employee, Paschall would contact Jones and ask whether there were available funds. *Id.* at 30-31; *see also* Ex. 16, McGuigan Decl., #73, at 25. Jones was also responsible for ensuring that the OIB's building was maintained. Ex. 16, McGuigan Decl., #73, at 75-76. Jones's department was

---

[1] The following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Rule of Civil Procedure 56.

[2] The "OIB has been closed since December 6, 2013." Declaration of Dacia Johnson, #70, ¶ 4.

responsible for processing the OIB's payroll. Ex. 15, McGuigan Decl., #73, at 28.

In February 2004, the OIB hired plaintiff as a Caregiver. Caravantes Decl., #74, ¶ 2. Plaintiff's duties included "providing clients with activities, . . . feeding clients who were unable to feed themselves, distributing medications, cleaning and caring for clients with contagious diseases, and assisting clients in the performance of their own jobs with [the] OIB." *Id.* ¶ 4. Plaintiff was also responsible for assisting wheelchair-bound clients use the restroom, including lifting and returning the clients to their wheelchairs. *Id.* ¶ 5. Shortly after plaintiff was hired, she was transferred to the kitchen. *Id.* ¶ 6. In June 2004, plaintiff was transferred to another Caregiver position, this time assisting clients "who required the highest level of care and assistance." *Id.*

In 2006, plaintiff began taking on additional duties. *Id.* ¶ 7. First, when the OIB's payroll specialist left, plaintiff took over the payroll specialist's job duties. *Id.* This included recording client and staff timesheets in a computer program and sending the completed forms to the payroll department at the OCB. *Id.* The "OCB was responsible for reviewing and approving the submitted timesheets and issuing pay checks." *Id.* Second, plaintiff began assisting Paschall with her duties as Director of the OIB, including performing Paschall's duties when Paschall was absent. *Id.* ¶ 8.

In 2008, Paschall spoke with Jones about hiring two on-call production workers.[3] Declaration of Desiree Paschall ("Paschall Decl."), #75, ¶ 3. Paschall ultimately hired Cesar

---

[3] Although not entirely clear from the record, it appears that the OIB had contracts with various outside businesses to produce goods. Ordinarily, the OIB employed its disabled clients to produce the goods, paying them at a per-piece rate. The on-call production workers were "responsible for finishing production of piece rate work so that [the] OIB [could] fulfill its contracts on time." Paschall Decl., #75, ¶ 3.

Sauceda and Denver Orozco, plaintiff's son, for the positions. *Id.*; *see also* Ex. 11, McGuigan Decl., #73, at 1. Jones approved the new hires in her capacity as the director of personnel/payroll. *See* Ex. 1, McGuigan Decl., #73, at 1; Ex. 2, McGuigan Decl., #73, at 1. As on-call production workers, Sauceda and Orozco were "paid on a piece rate basis." Paschall Decl., #75, ¶ 4. In 2010, Paschall spoke with Jones regarding the costs associated with hiring contractors to perform maintenance on the OIB's building. *Id.* ¶ 5. During this conversation, Paschall and Jones discussed the possibility of paying Sauceda and Orozco "a flat rate in exchange" for their maintenance services, as both men had relevant experience. *Id.* "Jones agreed that this was an acceptable arrangement." *Id.* In connection with how to pay Sauceda and Orozco, Jones instructed Paschall to "'figure it out' and 'do whatever [Paschall] want[ed].'" *Id.* ¶ 6. Thereafter, Paschall instructed plaintiff

> [t]o pay [Sauceda and Orozco] per hour. Per hour for the hours
> that they had worked. And to get to the amount that they were
> supposed to be there. What was done was that the staff [sic] for
> which they were not paid, the piece rate that the staff was doing
> that they had—that had to be added to—to their pay so that then
> they could reach the amount of their salary.

Ex. 13, McGuigan Decl., #73, at 69. Consistent with these instructions, Sauceda and Orozco would provide plaintiff with the hours that they worked each week, and plaintiff would record the hours in a computer program and provide the timesheets to the payroll department at the OCB. Caravantes Decl., #74, ¶ 10.

Beginning in September 2011, Paschall experienced health problems requiring her to take frequent medical leave. *Id.* ¶ 11. Plaintiff took over many of Paschall's job duties, while still performing her own duties. *Id.* During this time, Jones announced to the OIB staff that plaintiff

would be in charge of the office until Paschall returned from medical leave. *Id.*; Ex. 16,

McGuigan Decl., #73, at 24.  Plaintiff received a 5% pay increase for the months of October,

November, and December 2011 to compensate her for the additional work she was performing.[4]

Caravantes Decl., #74, ¶ 11; *see also* Ex. 3, McGuigan Decl., #73, at 1 (noting that plaintiff was

to "assume lead worker duties as of 10/1/11 in absence of program director"); Ex. 15, McGuigan

Decl., #73, at 78.

In April 2012, plaintiff learned that she was pregnant and that the pregnancy was

considered high risk.  Caravantes Decl., #74, ¶ 12.  Because her pregnancy was considered high

risk, plaintiff saw her doctor every two weeks.  *Id.*  Plaintiff informed Paschall, Jones, and Mock

of her high-risk pregnancy and provided them with a doctor's note indicating that she could not

lift more than twenty pounds due to her pregnancy.[5]  *Id.* ¶ 13; *see also* Ex. 4, McGuigan Decl.,

#73, at 1.

In early summer 2012, the OIB announced that it had an open Lead Worker position.  The

Lead Worker was to provide "additional support for the program," as Paschall was still

experiencing health problems and taking frequent leave and plaintiff was pregnant and would

presumably have doctors' appointments.  Ex. 15, McGuigan Decl., #73, at 85.  Among other

things, the Lead Worker was to assist in "staff management, including hiring, supervising,

evaluating, disciplining, promoting and discharging approximately sixteen staff."  Ex. 2, Johnson

---

[4] The Personnel Change Notice authorizing the 5% pay increase does not indicate for
which months plaintiff would receive the increase. *See* Ex. 3, McGuigan Decl., #73, at 1.  At
oral argument, the parties agreed that plaintiff received the pay increase only for the months of
October, November, and December 2011.

[5] The same note also indicates that plaintiff had a possible disc injury and that, due to
that injury, she should not lift more than ten pounds.  Caravantes Decl., #74, ¶ 13.

Decl., #70, at 2.  Jones was in charge of recruiting for the position.  Ex. 16, McGuigan Decl.,

#73, at 32; *see also* Ex. 15, McGuigan Decl., #73, at 76-77; Declaration of Veronica Chavez

("Chavez Decl."), #76, ¶ 14.  In June 2012, Jones showed a copy of the job announcement that

she was planning to post on Craigslist to Veronica Chavez, an employee at the OIB.  Chavez

Decl., #76, ¶ 14.  The announcement was only one page long and did not include any requirement

that the applicant have a bachelor's degree.  *Id.*  Jones thereafter posted a job announcement on

Craigslist.  It is not clear whether the job announcement Jones posted on Craigslist was same job

announcement Jones had shown Chavez.  A few individuals expressed interest in the position,

including plaintiff.  Ex. 15, McGuigan Decl., #73, at 85-86.  The Craigslist posting that plaintiff

saw was only one page long and did not require that the applicant have a bachelor's degree.

Caravantes Decl., #74, ¶ 14.  After plaintiff and the other individuals expressed interest, Jones

"changed the duties of the position."  Ex. 15, McGuigan Decl., #73, at 86.  It is not clear what

specifically Jones changed in the job announcement, but Chavez later saw a job announcement

for the position on Craigslist that was a few pages long and that required the applicant to have a

bachelor's degree.  Chavez Decl., #76, ¶ 14.  Under "Qualifications and Desired Attributes," the

announcement also lists:

- Minimum three years of experience in the rehabilitation field working with MR/DD adults;

- Two years of management experience; or six years in the field of rehabilitation, social services or a related field, including personnel supervision, budget development, program monitoring and evaluation . . . .

Ex. 2, Johnson Decl., #70, at 2.  The announcement further indicates that the "[i]nitial

appointment will be for three months, with an option for extension depending on need." *Id.*

Page 6 - OPINION AND ORDER

Plaintiff applied for the Lead Worker position, but the OIB did not interview her. Ex. 15, McGuigan Decl., #73, at 85-86. Rather, the OIB interviewed and ultimately hired Heather Schoenwald. Schoenwald was an OCB client (she had a vision impairment) who had a bachelor's degree in social work and a master's degree in clinical counseling. Ex. 3, Declaration of Tracy J. White ("White Decl."), #69, at 11, 14. Prior to going to school, Schoenwald had worked as a courtesy clerk at Westwood Thriftway and as a merchandiser and salesperson at Portland Bottling Company. Ex. 17, McGuigan Decl., #73, at 19-20. Prior to being hired as Lead Worker, Schoenwald did not have payroll experience and had never held a supervisory position. Ex. 16, McGuigan Decl., #73, at 44; Ex. 17, McGuigan Decl., #73, at 20. Schoenwald started at the OIB on July 3, 2012. Ex. 3, White Decl., #69, at 12; Ex. 5, McGuigan Decl., #73, at 1. Plaintiff and Paschall were responsible for training Schoenwald. Ex. 5, McGuigan Decl., #73, at 1; Ex. 17, McGuigan Decl., #73, at 20.

Shortly after Schoenwald started, Jones informed plaintiff that she would go back to performing Caregiver duties. Caravantes Decl., #74, ¶ 15. At this time, plaintiff was still subject to the weight-lifting restrictions due to her pregnancy. *Id.* On July 11, 2012, plaintiff asked Schoenwald to assist a client in the bathroom. *Id.* ¶ 16. Schoenwald refused, stating that assisting clients in the bathroom was not part of her job description. *Id.* Consequently, plaintiff "was forced to carry the client to the bathroom and in the process [she] slipped on urine and seriously injured [her] back." *Id.*

After this injury, plaintiff filed a grievance with Mock, complaining that, among other things, she did not receive the Lead Worker position and that she suffered an injury because she was forced to assist clients in the bathroom and Schoenwald was not. *Id.* ¶ 17. A few days later,

Mock confronted plaintiff about the grievance and, "[a]s a result of this confrontation, [plaintiff] began to bleed and went to the hospital." *Id.* Plaintiff called Mock from the hospital and left a message, but Mock did not respond. *Id.*

At some point, plaintiff filed a workers' compensation claim relating to the back injury she suffered while assisting a client in the bathroom. *See* Ex. 8, McGuigan Decl., #73, at 1. Although plaintiff wished to return to work with the restriction that she could not carry clients to the bathroom, Caravantes Decl., #74, ¶ 18, Jones told the SAIF, the workers' compensation insurance company, that there was no light-duty work available, Ex. 8, McGuigan Decl., #73, at 1.

Meanwhile, in early August 2012, Jones sent Schoenwald, who was now doing payroll duties, an email inquiring about Sauceda's and Orozco's timesheets, noting that the July timesheets did not have the same amount of "piece rate" work that their timesheets typically had. Ex. 7, McGuigan Decl., #73, at 1. In the email, Jones requests that Schoenwald "do a little investigating." *Id.* On August 22, 2012, Jones asked plaintiff about the timesheets. Caravantes Decl., #74, ¶ 19. Plaintiff reminded Jones that Jones had agreed to hire Sauceda and Orozco as on-call maintenance employees. *Id.* Jones also spoke with Paschall regarding Sauceda and Orozco. Paschall Decl., #75, ¶ 12. Paschall reminded Jones that Jones had "authorized [Sauceda's and Orozco's] initial hire in 2008 and that she authorized their change to maintenance personnel to save on contractor costs." *Id.* Paschall also told Jones "that it was her department who paid these employee and [Paschall] questioned [Jones's] position that from 2010 until 2012 she did not know what these individuals were paid for." *Id.*

On August 28, 2012, Jones sent Mock a draft of a letter addressed to plaintiff, informing

plaintiff that the OIB was terminating her employment because she misrepresented Sauceda's and

Orozco's hours on their timesheets. Ex. 10, McGuigan Decl., #73, at 1-3. This letter was

apparently not sent. Rather, on September 4, 2012, the OIB sent plaintiff a letter informing her

of allegations of misconduct and giving her an opportunity to appear at a "pre-disciplinary

meeting" on September 14, 2012. Ex. 11, McGuigan Decl., #73, at 1-3. Plaintiff elected to not

attend the meeting and, on September 19, 2012, the OIB sent plaintiff a termination letter. Ex. 5,

Johnson Decl., #70, at 1-3. That same date, the OIB also terminated Paschall on the grounds that

she failed to adequately verify Sauceda's and Orozco's hours and that she failed to provide

sufficient monitoring and oversight of plaintiff, particularly in light of the fact that Orozco was

plaintiff's son. Ex. 6, Johnson Decl., #70, at 1-3.

Shortly after plaintiff and Paschall were terminated, the OIB asked law enforcement to

investigate the matter. Ex. 12, McGuigan Decl., #73, at 1. Also after plaintiff was terminated,

Jones wrote a "memo to file" indicating that, had plaintiff not been terminated, she would have

been offered a light-duty position with the OIB, with a start date of October 2, 2012. Ex. 9,

McGuigan Decl., #73, at 1.

## PROCEDURAL BACKGROUND

Plaintiff filed the instant action on March 1, 2013. *See* Complaint, #1. In her second

amended complaint, plaintiff pleads three claims for relief. *See* Second Amended Complaint,

#22, ¶¶ 5.1-7.3. Under Count One, plaintiff alleges that defendants discriminated against her on

the basis of her sex/pregnancy. *Id.* ¶¶ 5.1-5.3. Under Count Two, plaintiff alleges that

defendants discriminated against her on the basis of her race and national origin. *Id.* ¶¶ 6.1-6.3.

Finally, under Count Three, plaintiff alleges that she was subjected to a hostile work environment

because of her race and national origin. *Id.* ¶¶ 7.1-7.3.

On July 1, 2014, defendants filed the instant motion for partial summary judgment, seeking judgment in their favor on Count One of plaintiff's second amended complaint. *See* Defendants' Motion for Partial Summary Judgment, #68. On July 22, 2014, plaintiff filed a response in opposition to the motion for partial summary judgment. *See* Plaintiff's Resistance to Motion for Partial Summary Judgment, #72. On August 14, 2014, defendants filed their reply in support of the motion for partial summary judgment. *See* Defendants' Reply in Support of Motion for Partial Summary Judgment, #79. On August 19, 2014, the court heard oral argument on the motion. The matter is fully submitted and ready for decision.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990).

## DISCUSSION

In the motion for partial summary judgment, defendants request that the court grant judgment in their favor on plaintiff's pregnancy-discrimination claim only. Before turning to defendants' arguments in favor of summary judgment, I will address plaintiff's evidentiary objection.

## I.      Evidentiary Objection

Plaintiff objects to the declaration of Dacia Johnson, which defendants filed in support of their motion for partial summary judgment. Plaintiff contends that Johnson, the current Executive Director of the OCB, was not personally involved in the incidents underlying this case and, because she has no personal knowledge, her declaration merely reflects "what she has been told by others." Plaintiffs' Resistance to Motion for Partial Summary Judgment, #72, at 15.

I find plaintiff's objection to be without merit. As defendants note in their reply brief, Johnson's declaration is, at least in part, "simply a certification that the summary judgment exhibits [are] true and accurate copies of documents from OIB/OCB's records. She is certainly qualified to state this as the Director of [the] OCB." Defendants' Reply in Support of Motion for Partial Summary Judgment, #79, at 2. Moreover, defendants contend that Johnson learned about some of the events at issue, including the fact that the OIB was hiring a Lead Worker and that plaintiff and Paschall were terminated for misconduct, during OCB staff meetings. Defendants submit a second declaration from Johnson to verify that, although she was not the Director of the OCB during the relevant time period, she was aware of these events. *See* Second Declaration of Dacia Johnson, #80. Thus, for the reasons set forth in defendants' reply brief, I overrule plaintiff's evidentiary objection.

## II.    Analysis

Defendants move for summary judgment on Count One of plaintiff's second amended complaint, which alleges that defendants discriminated against plaintiff because she was pregnant. Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee because of the employee's sex. 42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act, a 1978 amendment to Title VII, "specifies that sex discrimination includes discriminating on the basis of pregnancy." *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 277 (1987); *see also* 42 U.S.C. § 2000e(k).

A Title VII plaintiff may prove her case through direct evidence of discrimination or, alternatively, through circumstantial evidence, using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002). Under the *McDonnell Douglas* burden-shifting framework, the plaintiff bears the burden of establishing a prima facie case of discrimination. *Id.* The plaintiff's burden at this stage is minimal and she need not prove discrimination by a preponderance of the evidence. *Id.* If the plaintiff is able to establish a prima facie case, a rebuttable presumption of discrimination arises. *Id.* "The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* (quoting *Warren*, 58 F.3d at 442) (internal quotation mark omitted). If the employer satisfies this burden, the burden shifts back to the plaintiff to "demonstrate that the proffered nondiscriminatory reason is merely a pretext for discrimination." *Id.* The plaintiff may establish pretext either "(1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that the unlawful

discrimination more likely motivated the employer." *Id.* (citation omitted) (internal quotation marks omitted); *see also Arjangrad v. JPMorgan Chase Bank, N.A.*, No. 3:10-cv-01157-PK, 2012 WL 1189750, at *13 (D. Or. Apr. 9, 2012) (discussing the *McDonnell Douglas* burden-shifting framework).

   In this case, plaintiff alleges that defendants discriminated against her on the basis of her pregnancy when they failed to promote her to the Lead Worker position, forced her to carry clients to the bathroom, and terminated her. I shall consider each theory separately.

   A.    **Failure to Promote**

   First, plaintiff alleges that defendants violated Title VII when they failed to promote her to the Lead Worker position because she was pregnant. To make out a prima facie case of failure to promote under Title VII, a plaintiff must establish that: (1) she is a member of a protected class; (2) she applied for and was qualified for an open position; (3) the employer rejected her for the position; and (4) the employer filled the position with an individual outside of plaintiff's protected class. *See Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005). In this case, defendants concede that plaintiff is a member of a protected class, as she was pregnant at the time she was not selected for the Lead Worker position. Defendants also concede that they rejected her for the position and that the position was filled by a non-pregnant individual. Defendants contend, however, that plaintiff cannot establish a prima facie failure-to-promote claim because she was not qualified for the Lead Worker position, as she did not have a bachelor's degree.

   Plaintiff responds she was clearly capable of performing the duties of the Lead Worker position, as she had been performing those duties while Paschall was on medical leave. Plaintiff

further notes that Paschall, the Director of the OIB, did not have a bachelor's degree but Mock still hired her for the position in light of her experience. Finally, plaintiff contends that defendants created the bachelor's degree requirement to prevent plaintiff from obtaining the Lead Worker position, as evidenced by the fact that Jones changed the job announcement after plaintiff expressed interest in the job.

A reasonable jury could conclude that plaintiff was qualified for the Lead Worker position. Ordinarily, an individual is "qualified" for a position if he or she meets the criteria specified in the employer's job listing. *See Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 267-68 (E.D.N.Y. 2013) (collecting cases). In this case, the job announcement lists as a requirement that the individual have a bachelor's degree[6] and it is undisputed that plaintiff does not satisfy this requirement. Nevertheless, there is evidence from which a jury could conclude that plaintiff was qualified. First, there is evidence that Jones changed the job announcement to include a requirement that the candidate have a bachelor's degree *after* plaintiff expressed interest in the Lead Worker position. Chavez, an OIB employee, states that Jones showed her a copy of the job announcement prior to posting it on Craigslist and that there was no bachelor's degree requirement. Plaintiff contends that the job announcement that she saw did not have a bachelor's degree requirement. Jones admitted that, after plaintiff applied for the position, Jones changed the job announcement and Chavez states that she later saw the Lead Worker job announcement

---

[6] Plaintiff suggests that defendants may have altered the job announcement to require a bachelor's degree after plaintiff filed the instant action. There is no support for this assertion. As set forth below, there is evidence that the initial job posting did not include a bachelor's degree requirement, but Johnson, in her capacity as current Director of the OCB, declares that Exhibit 2 to her declaration is "a true and accurate copy of a Lead Worker Job Announcement for the [OIB], with a closing date of July 8." Johnson Decl., #70, ¶ 7.

on Craigslist and that, unlike the earlier announcement Jones had shown her, this announcement required a bachelor's degree.

Second, there is evidence that individuals without a bachelor's degree could adequately perform the Lead Worker job duties. As plaintiff notes, Paschall, the Director of the OIB and the individual to whom the Lead Worker was to provide assistance, did not have a bachelor's degree. *See* Paschall's Decl., #75, ¶ 1. Moreover, in Paschall's absence, plaintiff performed many of the job duties that the Lead Worker would be responsible for performing and, as plaintiff notes in her declaration, "no one expressed any concern to [her] about [her] lack of a Bachelor's Degree." Caravantes Decl., #74, ¶ 21.

Finally, there is evidence that the OIB hired other employees who did not satisfy the listed qualifications for their positions. For instance, Mock testified that, although Paschall did not meet the educational requirements for her position, she was nevertheless hired because she had relevant experience. *See* Ex. 16, McGuigan Decl., #73, at 45-46. Likewise, Schoenwald, the individual the OIB hired to fill the Lead Worker position, did not have any management or payroll experience, despite the job announcement's requirements that a successful candidate have either "[t]wo years of management experience" or "six years in the field of rehabilitation, social services or a related field, including personnel supervision, budget development, program monitoring and evaluation." Ex. 2, Johnson Decl., #70, at 2. Given that the OIB hired other individuals who failed to meet the minimum qualifications listed for their positions, a reasonable jury could conclude that, although plaintiff lacked a bachelor's degree, she was nevertheless qualified for the Lead Worker position. *See Aulicino v. N.Y. City Dep't of Homeless Servs.*, 580 F.3d 73, 81 (2d Cir. 2009) (concluding that, although the plaintiff arguably did not meet the

Page 15 - OPINION AND ORDER

qualifications listed in the job posting, a rational jury could nevertheless find the plaintiff qualified, as there was evidence that the employer hired other employees who did not meet the qualifications in the job posting).

In light of the above, I find that plaintiff has established a prima facie failure-to-promote claim and, under the *McDonnell Douglas* burden-shifting framework, the burden shifts to defendants to proffer a legitimate, nondiscriminatory reason for failing to promote plaintiff. Defendants contend that there are two legitimate reasons that plaintiff was not offered the promotion. First, defendants argue that offering the position to Schoenwald was consistent with the OCB and the OIB's mission, as Schoenwald was a visually impaired client at the OCB. Second, defendants contend that, because the Lead Worker position was originally advertised as a temporary position that was "partially designed to cover for plaintiff," as she had frequent doctors' appointments, it would be illogical for defendants to hire plaintiff to fill the position. Defendants' Reply in Support of Motion for Partial Summary Judgment, #79, at 5.

Because defendants have proffered nondiscriminatory reasons for the adverse employment action, the burden shifts back to plaintiff to show that the reasons are merely a pretext for discrimination. In her resistance, plaintiff argues that she meets this burden because Schoenwald had "no relevant experience whatsoever" and that, if the Lead Worker position were truly designed to support plaintiff, the Lead Worker should have had to report to plaintiff, "and not the other way around." Plaintiff's Resistance to Motion for Partial Summary Judgment, #72, at 22. For the reasons stated in plaintiff's resistance, I find that there are genuine issues of material fact with regard to whether defendants' proffered explanation is a pretext for discrimination. Although hiring Schoenwald may have been consistent with the OCB and the

Page 16 - OPINION AND ORDER

OIB's mission, defendants do not produce any evidence that this factor was central to their decision to hire Schoenwald rather than plaintiff. Moreover, although defendants characterize the Lead Worker position as a short-term position that would, in part, provide support for plaintiff, it was also a supervisory position and plaintiff was required to report to the Lead Worker. Defendants fail to explain why they could not have promoted plaintiff to the Lead Worker position and hired someone else to provide backup support as needed. *See Dominguez-Curry*, 424 F.3d at 1037 (noting that a plaintiff may show pretext "by showing that the employer's proffered explanation is unworthy of credence because it is inconsistent or otherwise not believable").

In light of the foregoing, I find that defendants are not entitled to summary judgment on Count One of the second amended complaint, insofar as that count alleges that defendants failed to promote plaintiff because she was pregnant.

### B.    Forced to Assist Clients in Bathroom

Plaintiff also contends that defendants violated Title VII when they forced her to assist clients in the bathroom. Plaintiff characterizes this theory as a disparate-treatment claim. She argues that, on the date that she was injured while helping a client to the bathroom, she was the only employee qualified to be a Lead Worker. Despite this fact, plaintiff notes that she was required to assist clients in the bathroom and Schoenwald, a non-pregnant individual, was not required to assist clients in the bathroom. Plaintiff suggests that the injury she sustained in July 2012 was a result of this discriminatory treatment.

I find plaintiff's argument to be without merit. Although plaintiff took on many additional supervisory duties while Paschall was out, the undisputed facts show that plaintiff held

Page 17 - OPINION AND ORDER

the job title of Caregiver in July 2012.[7]  As part of her duties as Caregiver, plaintiff was required

to assist clients to the bathroom.  *See* Caravantes Decl., #74, ¶ 5 ("One of my specific job duties

involved assisting clients in wheelchairs with the restroom.").  Although plaintiff suggests that

there is evidence of discrimination because defendants did not require Schoenwald to assist

clients in the bathroom, plaintiff fails to acknowledge that Schoenwald held a different position.

During her deposition, Schoenwald testified that assisting clients in the bathroom was not part of

her job duties as Lead Worker.  Ex. 17, McGuigan Decl., #73, at 46.  In an email to Mock, Jones

also stated that "bathrooming duties" were not part of Schoenwald's job.  Ex. 6, McGuigan Decl.,

#73, at 1.

     Thus, in light of the foregoing, I find that plaintiff's disparate-treatment claim, as

articulated in her brief and at oral argument, is without merit.  Accordingly, defendants are

entitled to summary judgment in their favor on the issue of whether they violated Title VII by

forcing plaintiff to assist clients in the bathroom.

## C.    Termination

     Finally, plaintiff claims that defendants violated Title VII by terminating her because she

was pregnant.  To establish a prima facie case of wrongful termination under Title VII, a plaintiff

must show that

---

[7] During oral argument, plaintiff's counsel argued that, pursuant to the OIB's Personnel
Change Notice, plaintiff's job title was changed to Lead Worker in October 2011, when she
received a 5% increase in pay.  Plaintiff's counsel further argued that the OIB never stripped
plaintiff of that title and, thus, in July 2012, she held the title of Lead Worker.  The evidence in
the record does not support this argument.  First, the Personnel Change Notice to which
plaintiff's counsel refers provides only that plaintiff was to "assume lead worker duties" during
Paschall's absence.  Ex. 3, McGuigan Decl., #73, at 1.  Second, in plaintiff's declaration, she
states that, on July 9, 2012, Jones "reassigned" plaintiff to Caregiver.  Caravantes Decl., #74,
¶ 15.  Thus, at the time that she sustained her injury, plaintiff's job title was Caregiver.

(1) she [was] a member of a protected class; (2) she was
performing her job in a satisfactory manner; (3) she suffered an
adverse employment action; and (4) . . . similarly situated
individuals outside her protected class were treated more favorably,
or other circumstances surrounding the adverse employment action
give rise to an inference of discrimination.

*Dannenbring v. Wynn Las Vegas, LLC*, No. 2:12-CV-00007 JCM (VCF), 2014 WL 518759, at

*3 (D. Nev. Feb. 7, 2014); *see also Leong v. Potter*, 347 F.3d 1117, 1124 (9th Cir. 2003);

*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002); *Nidds v. Schindler*

*Elevator Corp.*, 113 F.3d 912, 917 (9th Cir. 1996). In this case, defendants concede that plaintiff

was a member of a protected class and that she suffered an adverse employment action.

Defendants argue, however, that plaintiff cannot satisfy the second element of her prima facie

case, as she was discharged for alleged misconduct. Defendants further contend that plaintiff

cannot satisfy the fourth element of her prima facie case. Specifically, defendants note that

plaintiff cannot demonstrate that similarly situated individuals were treated differently. Like

plaintiff, Paschall was accused of committing timecard fraud. Like plaintiff, Paschall was

terminated for the alleged timecard fraud. Unlike plaintiff, however, there is no evidence in the

record that Paschall was pregnant.

Plaintiff responds that there is no evidence that she committed timecard fraud; rather,

Jones approved hiring Sauceda and Orozco as maintenance workers and Jones's department

approved Sauceda's and Orozco's hours for over two years. Thus, plaintiff argues that similarly

situated individuals were treated differently—that is, despite the facts that Jones approved hiring

Orozco and Sauceda and that her department approved their timecards, Jones was not fired along

with Paschall and plaintiff.

As an initial matter, I need not decide whether plaintiff actually committed timecard fraud. Defendants conceded at oral argument that there are genuine issues of material fact precluding summary judgment on this issue. Rather, the thrust of defendants' argument is that there are no facts suggesting that plaintiff's termination was a result of her pregnancy because Paschall was fired at the same time for the same reason. Plaintiff attempts to overcome this argument by suggesting that Jones was treated differently. While I find plaintiff's argument to be without merit, I nevertheless find that plaintiff has presented prima facie evidence that she was terminated on the basis of her pregnancy. Based on the evidence in the record, a jury could conclude that Paschall was really terminated because she was taking frequent leave on account of her health issues. Plaintiff was also taking frequent leave prior to her termination, as she had doctors' appointments every two weeks due to her high-risk pregnancy. Moreover, plaintiff was scheduled to go on maternity leave just a few months after she was terminated. Finally, if the jury were to find that the OIB's decision not to promote plaintiff to Lead Worker was motivated by her pregnancy, the jury could reasonably believe that the OIB's decision to terminate plaintiff was likewise motivated by the fact that she was pregnant. Thus, while plaintiff has not shown that similarly situated people were treated differently, she has pointed to facts giving rise to a reasonable inference of discrimination. *See Dannenbring*, 2014 WL 518759, at *3 (finding that the plaintiff established a prima facie case of pregnancy discrimination where she informed her employer that she was pregnant and "was terminated just weeks before her anticipated due date").

Because plaintiff has established a prima facie case, the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for plaintiff's termination. Defendants contend that they have satisfied this burden. Specifically, defendants argue that, regardless of whether

plaintiff actually committed timecard fraud, defendants believed that she did and, thus, they had a nondiscriminatory reason for plaintiff's termination. Plaintiff responds that defendants' proffered reason for terminating plaintiff is "simply unbelievable." Plaintiffs' Resistance to Motion for Partial Summary Judgment, #72, at 24. Specifically, plaintiff alleges that Jones approved paying Sauceda and Orozco at a flat rate and her department approved their paychecks for years. Thus, plaintiff maintains that Jones did not believe plaintiff committed fraud but, rather, leveled this allegation against plaintiff so that Jones could recommend her termination. In light of plaintiff's arguments, I find that plaintiff has carried her burden of showing that there are genuine issues of material fact with regard to whether defendants' proffered explanation is a pretext for discrimination.

Accordingly, defendants' motion for summary judgment should be denied insofar as it requests judgment in defendants' favor on plaintiff's discriminatory-discharge claim.

## CONCLUSION

For the reasons set forth above, defendants' motion for partial summary judgment (#68) is granted in part and denied in part.

Dated this 22nd day of August, 2014.

Honorable Paul Papak
United States Magistrate Judge